UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JIMMIE LEON GORDON,

        Petitioner,

                                          CASE NO. 08-10771
v.                                       HONORABLE NANCY G. EDMUNDS

BLAINE C. LAFLER,

        Respondent.

_____/

**OPINION AND ORDER
DENYING THE HABEAS CORPUS PETITION AND
GRANTING IN PART A CERTIFICATE OF APPEALABILITY AND
GRANTING LEAVE TO PROCEED _IN FORMA PAUPERIS_ ON APPEAL**

This matter is before the Court on petitioner Jimmie Leon Gordon's *pro se* habeas corpus petitions under 28 U.S.C. § 2254.  The habeas petitions challenge Petitioner's Wayne County convictions for one count of first-degree (premeditated) murder, Mich. Comp. Laws § 750.316(1)(a), two counts of felonious assault, Mich. Comp. Laws § 750.82, and one count of possessing a firearm during the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b.  Petitioner raises several claims regarding the trial judge, his trial attorney, the jury and the jury instructions, and the sufficiency of the evidence. Respondent Blaine C. Lafler argues in an answer to the petition that Petitioner procedurally defaulted several of his claims by failing to raise the claims on direct appeal or by failing to preserve the claims in the trial court.  Respondent also contends that the state-court decisions on Petitioner's claims were not contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts.  Having reviewed the pleadings and record, the Court agrees that Petitioner's claims do not warrant habeas corpus relief.

Accordingly, the habeas petition will be denied.

## I. Background

### A. The Trial and Sentence

Petitioner was charged with first-degree murder, felony firearm, and two counts of assault with intent to commit murder. The charges arose from a shooting outside Petitioner's home in Detroit, Michigan on October 16, 2004. Seventeen-year-old Francois Todd was shot and killed during the incident. His mother and sister were fired at, but not hit, during the incident. The evidence at Petitioner's jury trial in Wayne County Circuit Court established that,

> following a physical confrontation between the victim's sister [Fallon Walker] and [Petitioner's] girlfriend, Ebony Jackson, [Francois] and his mother [Latrell Todd] accompanied [Fallon] to [Petitioner's] home to retrieve her purse from a vehicle parked in [Petitioner's] driveway. As the trio looked for the purse inside the car, [Petitioner] came out of his house and onto the driveway where he remarked, "I know y'all didn't come to my house with this Ebony bullshit." After [Francois] demanded to know where Ebony was, [Petitioner] ran into his house, returned with a rifle, and fired six shots, one of which struck [Francois] in his back, in the direction of the trio. Upon realizing that [Francois] had been shot, [Ms. Todd] screamed at [Petitioner], asking him why he shot the rifle, to which [Petitioner] replied, "He shouldn't have ran up on me . . . I'm Pac-Man motherfucker," before leaving the scene and throwing the rifle in a trashcan.

*People v. Gordon*, No. 261834, 2006 WL 2924658, at *2 (Mich. Ct. App. Oct. 12, 2006) (unpublished).

On February 17, 2005, the jury found Petitioner guilty of one count of first-degree murder, two counts felonious assault (as a lesser-included offense of assault with intent to commit murder), and one count of felony firearm. On March 15, 2005, the trial court sentenced Petitioner to mandatory life imprisonment for the murder conviction, a concurrent term of seventeen months to four years in prison for the assault convictions, and a

2

consecutive term of two years in prison for the firearm conviction.

### B.  The Direct Appeal

On direct appeal from his convictions, Petitioner argued through counsel that:  (1) the trial court's "state-of-mind" jury instruction deprived him of his right to due process; (2) the trial court's failure to instruct the jury on voluntary manslaughter was reversible error; (3) the evidence at trial was insufficient to convict him of first-degree premeditated murder; (4) he was denied effective assistance of trial counsel because counsel (a) failed to present the testimony of witness Meshell Gates, (b) failed to object to the incorrect jury instruction on drawing inferences from the use of a weapon, and (c) failed to request a jury instruction on manslaughter.  In a *pro se* supplemental brief, Petitioner argued that:  (1) the prosecutor violated the witness-sequestration order; (2) the prosecutor made prejudicial references to an assault rifle during closing arguments; and (3) an officer tampered with the jury during its deliberations.  The Michigan Court of Appeals rejected all of Petitioner's claims and affirmed his convictions in an unpublished decision.  *See Gordon*, 2006 WL 2924658.  On March 26, 2007, the Michigan Supreme Court denied leave to appeal.  *See People v. Gordon*, 477 Mich. 1056;  728 N.W.2d 416 (2007) (table).

### C.  The Initial Habeas Corpus Petition and Motion for a Stay

Petitioner commenced this action in 2008.  Although he did not file a supporting brief, he attached the decision of the Michigan Court of Appeals to his petition and stated that he was  raising the same claims that he presented to the state courts on direct appeal.  *See* Pet. for Writ of Habeas Corpus at 2 (ECF No. 1 at 2).  Before Respondent could file an answer to the petition, Petitioner moved for a stay while he pursued post-conviction remedies in state court.  *See* Mot. for Stay and Abeyance of Habeas Pet. (ECF No. 4).  On

3

August 7, 2008, the Court granted Petitioner's motion and closed this case for administrative purposes. *See* Order Granting Pet'r Mot. for a Stay, Vacating the Order for Responsive Pleading, and Closing Case for Administrative Purposes (ECF No. 5).

### D.  State Collateral Proceedings

Petitioner subsequently filed a post-conviction motion in the state trial court.  He argued that:  (1) the trial judge exhibited bias by (a) belittling defense counsel, (b) reading newspapers and magazines when the defense put on its case, (c) giving the impression that he thought the defendant's testimony was a bunch of lies, (d) interrupting counsel during summation and inferring that defense counsel was lying to the jury, (e) treating defense counsel's objections with contempt, and (f) holding counsel in contempt and fining him, but later admitting that he used the contempt charge to calm down counsel; and (2) he was deprived of effective assistance of trial counsel because counsel failed to (a) follow the trial court's instructions to file a motion for new trial regarding judicial misconduct and a police officer's unauthorized communication with the jury and (b) call two doctors whose reports stated that the victim was shot in the chest.  The trial court conducted an evidentiary hearing and then denied Petitioner's motion.  The Michigan Court of Appeals denied leave to appeal the trial court's decision because Petitioner failed to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Gordon*, No. 300247 (Mich. Ct. App. July 20, 2011).  On March 5, 2012, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v. Gordon*, 491 Mich. 851; 808 N.W.2d 767 (2012).

### E.  The Supplemental Petition, Answer, and Reply

In 2012, Petitioner returned to this Court and filed a supplemental habeas corpus

petition with a motion to lift the stay and to re-open this case. *See* Mot. to Lift Stay and Reopen Case (ECF No. 10) and Pet. for Writ of Habeas Corpus (ECF No. 11). The Court granted Petitioner's motion and ordered Respondent to file a responsive pleading. *See* Order Granting Pet'r Mot. to Lift Stay, etc. (ECF No. 12). Respondent then filed a response to the petition (ECF No. 21), and Petitioner filed a reply (ECF No. 28).

The parties have numbered Petitioner's grounds for relief as follows: (1) the trial judge was biased; (2) defense counsel's trial conduct and failure to file a motion for new trial amounted to ineffective assistance; (3) the jury instruction on "state of mind" deprived Petitioner of due process; (4) the trial court's failure to instruct the jury on voluntary manslaughter was reversible error; (5) the evidence at trial was insufficient to sustain the murder conviction; (6) defense counsel's failure to present Meshell Gates, failure to object to the jury instruction on inferring intent, and failure to request a jury instruction on manslaughter constituted ineffective assistance of counsel; (7) the prosecutor violated the witness-sequestration order; (8) the prosecutor made improper comments and prejudicial references to an assault rifle during closing arguments; and (9) the jury was tampered with during its deliberations. Respondent contends that a number of these claims are procedurally defaulted. Petitioner concedes that his claims about the prosecutor are procedurally defaulted. Consequently, he has withdrawn his seventh and eighth claims regarding the prosecutor's conduct and remarks.

## II. Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97

(2011).  Pursuant to § 2254, the Court may not grant a state prisoner's application for the

writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the

merits

> (1)    resulted in a decision that was contrary to, or involved an
>        unreasonable application of, clearly established Federal law, as
>        determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable
>        determination of the facts in light of the evidence presented in
>        the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may
> grant the writ if the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has on a set of materially
> indistinguishable facts.  Under the "unreasonable application" clause [of §
> 2254(d)(1)], a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from [the Supreme] Court's
> decisions but unreasonably applies that principle to the facts of the prisoner's
> case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part

II).  "[A] federal habeas court may not issue the writ simply because that court concludes

in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly.  Rather, that application must also be

unreasonable."  *Id.* at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court

rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court

decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)

(*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  "A state court's determination that

a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

### III. Analysis

#### A. The Trial Judge (claim one)

Petitioner alleges that he was denied a fair trial and due process of law because the trial judge was actually biased against him or gave the appearance of judicial basis. Respondent argues that this claim is procedurally defaulted because Petitioner did not raise his claim on direct appeal, and when he raised the claim in his post-judgment motion, the trial court's successor, Wayne County Circuit Judge Carole F. Youngblood, cited Michigan Court Rule 6.508(D)(3) in her order denying the motion.

Rule 6.508(D)(3) generally prohibits state courts from granting relief from judgment if the defendant could have raised his claim on appeal from his conviction. Judge Youngblood, however, did not apply this rule in her order denying Petitioner's post-judgment motion. She merely cited the rule, along with the other subdivisions of the rule, and then proceeded to address the merits of Petitioner's claim. This Court, therefore, agrees with Petitioner that his first claim is not procedurally defaulted.

As for the merits of Petitioner's claim, Judge Youngblood determined that the trial judge did not improperly influence the jury, nor deprive Petitioner of a fair trial. In reaching

7

this conclusion, Judge Youngblood noted that, although some the trial judge's conduct could be considered rude in other circumstances, many of the verbal conflicts were precipitated by defense counsel's overzealous conduct, repeated objections to the judge's rulings, and refusal to do as the judge requested.

### 1.  Clearly Established Federal Law

"[T]he Due Process Clause [of the Fourteenth Amendment to the United States Constitution] clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-905 (1997) (internal and end citations omitted.  "Trial judges have a wide latitude in conducting trials, but they must carefully preserve an attitude of impartiality and scrupulously avoid giving the jury an impression that the judge believes the defendant is guilty." *Harrington v. Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997) (quotation marks and citations omitted).   A defendant has the right to an impartial judge "[n]o matter what the evidence was against him." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927).  Thus, the violation of the right to an impartial judge can never be treated as harmless error.  *Gomez v. United States*, 490 U.S. 858, 876 (1989).  However,

> "[u]nless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction." *Brinlee v. Crisp*, 608 F.2d 839, 853 (10th Cir. 1979), *cert. denied*, 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980).  In collateral proceedings, the test is "whether the errors alleged . . . could have rendered [the] trial fundamentally unfair." *Buckelew v. United States*, 575 F.2d 515, 518 (5th Cir. 1978).  To violate a defendant's right to a fair trial, "a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree." *Daye v. Attorney General of New York*, 712 F.2d 1566, 1572 (2d Cir. 1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984).

*McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985).  So, to prevail on his claim, Petitioner

must show "there was bias, or such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964).

### 2. General Allegations about the Trial Judge

As evidence of judicial bias, Petitioner relies on his trial attorney's answer to Petitioner's grievance about the attorney before the Attorney Grievance Commission. In his answer to the grievance, defense counsel stated, among other things, that the trial judge in Petitioner's case

> picked arguments with counsel. The Judge belittled counsel at every opportunity. The Judge made it seem as if counsel's objections were meaningless and attempts to confuse the jury. The Judge allowed the prosecution to present a case that bent the rules of evidence. When the defense put on its case the Judge read newspapers and magazines. In particular, when Mr. Gordon testified the Judge read, looked around and gave the impression that he thought the testimony was a bunch of lies. When defense witnesses testified the Judge was reading and at the conclusion of direct examination quickly moved the witnesses out as if what they testified to was not true.
>
> I had to object. The Judge treated my objections with contempt. The Judge treated our case with contempt and the jury got his message. The Judge refused to grant any of my objections. He made it appear as if my objections were silly and deserved no merit.
>
> . . . .
>
> I did not commit any acts that would violate the rules of conduct. I vigorously represented Mr. Gordon in a courtroom where the Judge was determined to convict him. I made the record despite the Judge['s] very real attempts to manipulate the trial and prevent me from making a record. There was nothing else I could do. We presented a great defense. The Judge nullified that defense through his behavior and his position. The Judge constantly and continually attacked the defense throughout the trial. Mr. Gordon did not receive a fair trial.

Pet. for Writ of Habeas Corpus (ECF No. 11), Ex. A, at unnumbered page 2. The attorney

9

made similar allegations at the state evidentiary hearing. *See* Evidentiary Hr'g Tr. 63-71, 102-03, 105-06, May 22, 2009; Evidentiary Hr'g Tr. 9-13, 19, 26, 33, June 19, 2009.

It is impossible to tell from the transcript of trial whether the trial judge read newspapers and magazines while defense witnesses testified or whether the judge gave the impression through his conduct and nonverbal messages to the jury that he thought Petitioner was lying when he testified. But a number of defense counsel's other allegations about the trial judge clearly are not supported by the record. It simply is not true that the trial judge "belittled counsel at every opportunity," refused to grant any of his objections or treated his objections with contempt. The trial judge recognized defense counsel's absolute right to object for purposes of the record *(*Trial Tr. Vol. I, 6-9, Feb. 14, 2005) and sustained a number of defense counsel's objections . *See, e.g.,* Trial Tr. Vol. I, 190-91, Feb. 14, 2005 (sustaining defense counsel's objections to the prosecutor's lack of foundation for a question); Trial Tr. Vol. III, 7, Feb. 16, 2005 (sustaining defense counsel's objection to the prosecutor's request to have a witness declared an expert); *id.* at 25 (sustaining defense counsel's objection to a witness's speculative testimony); *id.* at 85 and 88-89 (sustaining defense counsel's objections to hearsay).

The court also overruled many of the prosecutor's objections to defense counsel's questions and tactics. *See, e.g.,* Trial Tr. Vol. I, 4-5, Feb. 14, 2005 (telling the prosecutor that the court could not stop defense counsel from calling a witness to testify about Fallon Walker's behavior during medical treatment); *id.* at 9-10 (rejecting the prosecutor's request to instruct Petitioner's supporters not to talk about the case in the hallway); *id.* at 178 and 180 (overruling the prosecutor's objections to defense counsel's attempt to elicit alleged hearsay); *id.* at 212 (overruling the prosecutor's objection to the relevance of a question

10

about Petitioner's nickname); Trial Tr. Vol. II, 159, Feb. 15, 2005 (overruling the prosecutor's objection to defense counsel's question about what a witness saw); Trial Tr. Vol. III, 47, 50-51, 54, Feb. 16, 2005 (overruling the prosecutor's objections and allowing Petitioner to continue his re-cross examination of the witness); *id.* at 96-99 (overruling the prosecutor's objections, including an objection that defense counsel was arguing and screaming at a witness, and allowing defense counsel to continue his cross-examination of the witness); *id.* at 118 (overruling the prosecutor's relevancy objection); *id.* at 119 (*sua sponte* objecting to a question asked by the prosecutor).

Several times the trial judge allowed defense counsel to proceed even when the judge apparently thought defense counsel had violated the rules of evidence.  *See, e.g.,* Trial Tr. Vol. I, 212, Feb. 14, 2005 (allowing defense counsel to proceed even though a question had been asked and answered); *id.* at 223 (stating in response to the prosecutor's objection about the relevance of a question, "I'm just tired of battering back and forth and arguing,  I'm just going to give him carte blanche."); Trial Tr. Vol. III, 117, Feb. 16, 2005) (overruling the prosecutor's objection to hearsay even though it was hearsay); *id.* at 118-19 (permitting "totally irrelevant" testimony elicited by defense counsel to be admitted); *id.* at 134, 165, and 189 (allowing defense counsel to lead a witness); *id.* at 169 (allowing defense counsel to proceed despite the way he characterized someone's conduct).

To his credit, the trial judge permitted defense counsel to recall any witnesses he wanted (Trial Tr. Vol. II, 160, Feb. 15, 2005) and to have the prosecution produce the witnesses that defense counsel requested (*id.* at 203-06).  The judge also granted most of defense counsel's requests for specific jury instructions.  (Trial Tr. Vol. III, 192-93, Feb. 16, 2005; Trial Tr. Vol. IV, 95-97, Feb. 17, 2005.)

11

Admittedly, there were times when the trial court admonished defense counsel for asking irrelevant questions or for being repetitive or argumentative. *See, e.g.*, Trial Tr. Vol. I, 138-39, 145-47, 155, 222, Feb. 14, 2005; Trial Tr. Vol. II, 65,129-30, 183-84, Feb. 15, 2005. But a trial judge is not a "mere moderator" in a jury trial; he or she "is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia v. United States*, 289 U.S. 466, 469 (1933).

### 3. Specific Allegations about the Trial Judge

In his habeas petition, Petitioner refers to the following additional instances of alleged judicial bias:

1. The trial court told defense counsel more than once to sit down. The first time occurred when defense counsel argued with a prosecution witness. (Trial Tr. Vol. I, 155-56, Feb. 14, 2005.) On another occasion, the trial court told defense counsel to "sit down and shut up for a moment." This happened when defense counsel continued to object after the trial judge told a witness to answer a question "yes" or "no." (Trial Tr. Vol. III, 139-40, Feb. 16, 2005.)

2. On the first day of trial, the trial court refused to sequester a prosecution witness that defense counsel considered recalling at a later point in the trial. The trial court ruled that, once a witness testified, the witness could remain in the courtroom. (Trial Tr. Vol. I, 166-68, Feb. 14, 2005.)

The issue arose again on the second day of trial when the prosecutor permitted Fallon Walker and Latrell Todd, who had already testified, to step into the witness room where a few officers were waiting to testify. The prosecutor's reason for doing this was that Petitioner's family was in the hallway. The trial judge allowed defense counsel to make an objection and suggest a solution, but he allowed the officers to testify. (Trial Tr. Vol. II, 99-103, Feb. 15, 2005.)

3. Defense counsel objected to an *ex parte* communication between the trial court and the prosecutor while defense counsel was out of the courtroom. The prosecutor apparently asked the trial judge in defense counsel's absence whether the next witness could be declared a hostile witness. When defense counsel objected to the *ex parte* communication, the trial judge asked defense counsel whether he wished to make anymore

12

accusations.  (Trial Tr. Vol. I, 202-03, Feb. 14, 2005.)

4.  The prosecutor objected when defense counsel asked Petitioner's mother why she did not hear any gunshots.  The court ruled that, if the witness did not hear the gunshots, that was the end of the matter.  Defense counsel's question, however, apparently provoked laughter in the courtroom, because defense counsel said that he did not see anything funny about his question.  The trial judge then assured defense counsel that he was not laughing, but defense counsel complained that the court had not stopped other people from laughing.  The court told defense counsel to stop the battering, to continue his cross-examination, to remember that only the court made rulings, and that defense counsel could do only what the court said he had a right to do.  (*Id.* at 220-21.)

5.  The trial court informed defense counsel that he had asked a question five or six times.  When defense counsel asked whether the prosecutor should be making that objection, the trial court judge stated that he, too, could make an objection.  (Trial Tr. Vol. II, 183, Feb. 15, 2005.)

6.  The prosecutor made an objection on the basis that defense counsel was arguing with a witness.  The trial court agreed, but when defense counsel maintained that he was merely correcting the witness, the court said, "Oh, Mister – oh, come on. . . .  [Y]ou are making judgments you can't make."  (Trial Tr. Vol. III, 44, Feb. 16, 2005.)

 These incidents do not reflect actual bias on the part of the trial judge.  Instead, telling defense counsel not to argue with witnesses, ruling on a sequestration request, and reminding defense counsel that only the judge makes rulings was appropriate judicial conduct.  The trial judge was moderating the trial for the purpose of assuring proper conduct.

As for the judge's question about whether defense counsel had any other accusations to make, the question was somewhat sarcastic, but it was made in the jury's absence and, therefore, did not give an appearance of bias to the jury.  And when the trial judge stated that he was entitled to make objections, defense counsel agreed and said, "You're right.  You're absolutely right."  The "oh, come on" remark also was not indicative

13

of bias because the trial judge subsequently allowed defense counsel to continue cross-examining the witness and merely advised defense counsel not to argue with the witness. (*Id.* at 44-45.)

### 4. Holding Defense Counsel in Contempt and Commenting on Defense Counsel's Lack of Courtesy

Somewhat more troubling are the following questions that the trial judge directed to defense counsel: "Am I being chastised?" and "[D]on't they teach you legal courtesy in law school these days." (*Id.* at 52.)  But even these questions were tempered with the judge's remarks to "be a little more diplomatic in your tone," and "please observe a little bit [of courtesy.]" *Id.*

The most troubling comments were a threat to hold defense counsel in contempt of court for suggesting that the court was biased (Trial Tr. Vol. II, 72-73, Feb. 15, 2005) and the court's remark that defense counsel had made a false statement (Trial Tr. Vol. IV, 65, Feb. 17, 2005).  Both remarks were made in the jury's presence.  The latter remark occurred during the prosecutor's rebuttal argument.  The prosecutor explained that she put the evidence technician on the witness stand last because she could not locate him sooner. Defense counsel objected on the ground that what the prosecutor was saying was not part of the record.  The trial court then started to remind defense counsel that they had adjourned court early one day due to the missing witness.  Defense counsel interrupted the judge to say, "How dare you, Judge. . . . How dare you do that." (Trial Tr. Vol. IV, 65 , Feb. 17, 2005.)  The judge responded, "Listen, don't you ever say that to me again.  Now, I'm going to tell the jury because you brought it up and made a false statement."  *Id.*

The trial judge then excused the jury and informed defense counsel that he was "one

14

of the most obnoxious, overbearing attorneys [the judge had] ever had the displeasure to

try a case with."   The judge found defense counsel in contempt of court because counsel

"[knew] darn well that [the judge] adjourned court one day because that witness was in

another courtroom and was not available." (*Id.* at 66)  Continuing, the judge said,

> Since you brought it up and you left that hanging there, I am going to tell the
> jury the truth of the matter.  You should have left it alone.
>
> But anyway, it's found that you are in contempt of court.  You're going
> to have to pay $100.00 before you leave this building.  If you continue to do
> it, it's going to be another $100.00.
>
> And I will tell you this:  You are the first attorney in my 27 years I have
> ever held in contempt of court.
>
> Now, from this point on you will sit down and you will be quiet, and you
> will shut up.  The record is clear.  It you want to appeal me, you can.  But
> from this point you are silent; you have nothing else to say.
>
> . . .
>
> You are in contempt – no, don't give me that you have to defend your
> client, you're not doing that.
>
> . . . .
>
> You are attacking this Prosecutor about a witness who was not in
> court, and intermediating or leaving it suspect that the Prosecutor is in some
> way trying, by some device, to hold the witness last, and you know darn well
> that I sat here half the afternoon waiting for that person to come in.  . . .

(*Id.* at 66-67.)

When defense counsel continued to object, the trial court once again informed him

that he was not only lying, but he was "the most obnoxious attorney [the court] had the

displeasure to try a case with."  (*Id.* at 68.)  When the jurors were brought back into the

courtroom, the court informed them that the truth of the matter was that the evidence

technician testified last because he could not be located on the day that they needed him.

15

*Id.* at 69.

The trial judge's decision to hold counsel in contempt of court and his remark about defense counsel being obnoxious were made in the jury's absence.  *Cf. Lyell v. Renico*, 470 F.3d 1177, 1188 (6th Cir. 2006) (granting habeas relief on the basis of judicial misconduct, in part, because of the "trial judge's inexplicable decision to issue a contempt order against Lyell's counsel in front of the jury").  And even though the judge obviously was angry at defense counsel,

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible . . . .  *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display.  A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (emphasis in original).[1]

The trial court's remarks in this case do not reveal a deep-seated or high degree of antagonism that made fair judgment impossible.  In fact, despite the court's angry outburst about defense counsel being obnoxious and overbearing, the judge subsequently rescinded the $100.00 contempt-of-court fine, telling defense counsel that he merely

---

[1] Although *Liteky* "addresses the statutory recusal standards for federal judges, see 28 U.S.C. § 455, [the Sixth Circuit Court of Appeals] has relied on the decision in assessing judicial-bias claims under the Due Process Clause . . . ."  *Lyell*, 470 F.3d at 1186 (citing *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002)).

wanted counsel to behave.  (Trial Tr. Vol. IV, 96, Feb. 17, 2005).  As further evidence that

the judge was capable of being fair, the judge granted defense counsel's request to recall

the jurors after the charge to the jury and to instruct them that police officers should be

judged by the same standard as other witnesses and that the number of witnesses is not

important. (*Id.* at 95-97.)

Furthermore, under AEDPA, the Court is required to defer to Judge Youngblood's

reasonable conclusion that the trial judge did not improperly influence the jury or deprive

Petitioner of a fair trial.  For all these reasons, the Court declines to grant relief on

Petitioner's judicial-bias claim.

### B.  The Jury Instructions

Petitioner's third and fourth claims challenge the trial court's jury instructions.

Petitioner contends that the trial court violated his right to due process (1) by instructing the

jury that they could infer intent to kill from the use of a deadly weapon and (2) by failing to

instruct the jury in voluntary manslaughter.  Respondent argues that Petitioner procedurally

defaulted these claims by not objecting to the instruction on inferring intent and by failing

to request an instruction in voluntary manslaughter.  Petitioner admits that the claims are

procedurally defaulted.  He nevertheless maintains that he can overcome the procedural

defaults by showing that defense counsel was ineffective for failing to raise the issues in

the trial court.

A procedural default is "a critical failure to comply with state procedural law."  *Trest*

*v. Cain*, 522 U.S. 87, 89 (1997).  The doctrine of procedural default prohibits a federal court

from reviewing the merits of a state prisoner's claims, including constitutional claims, if a

state court declined to hear the claims because the prisoner failed to abide by a state

17

procedural rule. *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). To prevail on a procedurally defaulted claim, a prisoner "must establish cause and prejudice for the defaults" and "also show that the claims are meritorious." *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010).

Petitioner's claims lack merit, and "a procedural default . . . is not a jurisdictional matter." *Trest*, 522 U.S. at 89. Further, a determination of whether Petitioner's claims about the jury instructions are procedurally defaulted "adds nothing but complexity to the case." *Babick*, 620 F.3d at 576. The Court therefore proceeds directly to the merits of Petitioner's claims.

### 1. Inferring Intent (claim three)

Petitioner alleges that the trial court's jury instruction on inferring intent from the use of a deadly weapon deprived him of due process. He claims that the jury could have applied the instruction in a way that relieved the prosecution of its burden of proving an intent to kill. Petitioner also claims that the jury could have interpreted the instruction to mean that his self-defense claim was legally inadequate because he admitted to using a deadly weapon.

The Michigan Court of Appeals reviewed Petitioner's claim for "plain error" because Petitioner failed to object to the claim in the trial court. The Court of Appeals then concluded that there was no plain error because the jury was not instructed to presume an intent to kill from Petitioner's use of a deadly weapon.

### a. Legal Framework

[I]t is well established that the fundamental fairness guarantee of the Due Process Clause requires the prosecution to prove beyond a reasonable doubt

18

> every element of the offense.  *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970); *McMillan v. Pennsylania*, 477 U.S. 79, 85, 106 S.Ct. 2411, 2415–2416, 91 L.Ed.2d 67 (1986).  This constitutional principle "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis v. Franklin*, 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).  Thus, [the Supreme Court has] held that mandatory presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of the offense.  *Patterson v. New York*, 432 U.S. 197, 215, 97 S.Ct. 2319, 2329–30, 53 L.Ed.2d 281 (1977); *Sandstrom*, *supra*, 442 U.S., at 520–524, 99 S.Ct., at 2457–2459.  By contrast, a permissive inference is not a violation of due process because the State still has the burden of persuading the jury that the suggested conclusion should be inferred based on the predicate facts proved.  *Ulster County Court v. Allen*, 442 U.S. 140, 157–163, 99 S.Ct. 2213, 2224–2228, 60 L.Ed.2d 777 (1979).

*Estelle v. McGuire*, 502 U.S. 62, 78-79 (1991) (O'Connor, J., concurring in part and dissenting in part).

### b.  Application

The trial court instructed Petitioner's jurors that, when determining a person's intent, they could "consider the nature of the weapon that was used."  (Trial Tr. Vol. IV, 85, Feb. 17, 2005).  The court then said:  "You may infer an intent to kill by the use of a dangerous weapon.  And it is alleged in this case that the weapon was a firearm."  *Id.*

By using the word "may," as opposed to "must," the trial court communicated to the jury that they could, but were not required to, infer an intent to kill from the use of a dangerous weapon.   A jury instruction that tells the jury it "'may infer' intent . . . is a permissive inference;" it "allows an inference of intent but does not demand it." *Turnpaugh v. Foltz*, No. 85-1563, 1986 WL 16141, at *3 (6th Cir. Dec. 2, 1986) (unpublished). Because the challenged sentence was not "cast in the language of command," *Franklin*,

19

471 U.S. at 316, a reasonable juror could not have interpreted the trial court's instruction in this case as a mandatory presumption that shifted the burden of proof on the element of intent to Petitioner. Accordingly, Petitioner's right to due process was not violated, and he has no right to relief on the basis of his claim about the jury instruction on inferring intent.

### 2. The Lack of a Jury Instruction on Voluntary Manslaughter (claim four)

Petitioner alleges that the trial court's failure to instruct the jury on voluntary manslaughter was reversible error because the omission was inconsistent with the rudimentary demands of fair procedure and resulted in a miscarriage of justice. The Michigan Court of Appeals reviewed this claim for "plain error" affecting substantial rights because Petitioner did not ask the trial court for a jury instruction on manslaughter. The Court of Appeals went on to say that Petitioner's "cursory and conclusive argument [was] insufficient to properly place [the] matter before [the Court], let alone establish the plain error required for relief in this matter." *Gordon*, 2006 WL 2924658, at *1. The Court of Appeals also found that the failure to instruct on voluntary manslaughter was harmless, given the jury's rejection of the lesser-included offense of second-degree murder.

### a. Case Law on Lesser-Included Offenses

The United States Supreme Court has not determined whether the failure to give jury instructions on lesser-included offenses in non-capital cases such as this one violates the right to due process. *See Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980) (stating that "[w]e need not and do not decide whether the Due Process Clause would require the giving of such instructions in a noncapital case"). Thus, the "failure to instruct on a lesser included

20

offense in a noncapital case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (quoting *Bagby v. Sowders,* 894 F.2d 792, 797 (6th Cir. 1990) (*en banc*)).

The Court recognizes that Petitioner was charged with first-degree murder, an offense that carries the State's most severe penalty upon conviction (life imprisonment without the possibility of parole). *See* Mich. Comp. Laws § 750.316(1). But even if this case were deemed comparable to a capital case, a lesser-included offense instruction is not required when the evidence does not support it. *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001). In Michigan, a defendant charged with murder is entitled to an instruction on manslaughter only if the instruction was "supported by a rational view of the evidence." *People v. Mendoza*, 468 Mich. 527, 541; 664 N.W.2d 685, 693 (2003).

"Murder and manslaughter are both homicides and share the element of being intentional killings." *People v. Pouncey*, 437 Mich. 382, 388 ; 471 N.W.2d 346, 350 (1991). "The elements of voluntary manslaughter are (1) the defendant must kill in the heat of passion, (2) the passion must be caused by an adequate provocation, and (3) there cannot be a lapse of time during which a reasonable person could control his passions." *People v. Sullivan*, 231 Mich. App. 510, 518; 586 N.W.2d 578, 582 (1998).

The element of provocation distinguishes manslaughter from murder. *Pouncey*, 437 Mich. at 388; 471 N.W.2d at 350. "The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason." *Id.*, 437 Mich. at 389; 471 N.W.2d at 350. "In addition, the provocation must be adequate, namely, that which would cause the reasonable person to lose control." *Id.*

### b. Application

Petitioner testified that, on the night in question, he went outside because he left his cell phone in his car. He claimed that, while he was in his garage, he saw two men run up his driveway. He panicked and hurried back to the side door of his house. One of the men ran in the house behind him. As he pushed the man out of his house, he heard someone say, "Here go the bitches out here." He thought the man might be referring to his sisters, his girlfriend, or his relatives. The two men subsequently left the house, but he was terrified and did not know what was happening. So, he retrieved a rifle from a closet and went back outside with the intent to scare the men away or get them off his property. He did not intend to shoot anybody, but when he got outside, he saw the men behind his girlfriend's car. He thought they might have his girlfriend, although nobody said anything to him. When he heard gunshots, he returned fire. (Trial Tr. Vol. III, 166-75, Feb. 16, 2005.)

Petitioner denied knowing who the men were, and he claimed at one point that the shooting was a mistake and an accident. (*Id.* at 176, 179.) He also claimed that he was defending his property, himself, and his household. (*Id.* at 183.) Elsewhere, he claimed that he did not shoot anyone and that he fired his gun because he heard shots coming from behind the truck. He also testified that, if he had seen anyone outside, he would not have fired his gun. (*Id.* at 188-89.) And he admitted that, after the shooting, he did not wait for the police to arrive, but ran to his grandmother's house instead and dumped the gun in a trash can along the way. (*Id.* at 179-81.)

Although "[a] defendant acting out of a state of terror . . . is considered to have acted in the 'heat of passion,' " *People v. Townes*, 391 Mich. 578, 589 n. 3, 590; 218 N.W.2d 136,

22

140 n.3 (1974), Petitioner's own version of the facts suggests that he had enough time to cool off before the shooting. And even if he was scared and confused after the scuffling at his side door, "his decision to retrieve the gun was a deliberate and reasoned act." *Pouncey*, 437 Mich. at 390; 471 N.W.2d at 351. Furthermore, he was not compelled to go back outside; he could have stayed in the house. Instead, he chose to retrieve the shotgun from a closet in the house and go back outside. Given these facts, the evidence did not support a jury instruction on voluntary manslaughter. *Cf. Pouncey*, 437 Mich. at 392; 471 N.W.2d at 351 (concluding that the evidence at trial did not support a finding that the defendant was guilty of voluntary manslaughter because: sufficient time passed to "cool off;" after a few insults were exchanged, the defendant went into a house, which was a safe harbor; no one compelled the defendant to go back outside; he could have stayed inside, but chose instead to retrieve a gun from a closet in the house and go back outside where he shot and killed the victim).

The Court concludes that the evidence did not support a finding that Petitioner acted in the heat of passion, that he was adequately provoked, or that there was an inadequate amount of time for a reasonable person to control his emotions. Thus, the state appellate court's conclusion that Petitioner failed to demonstrate plain error affecting his substantial rights was objectively reasonable.

Even if constitutional error occurred, the jury chose not to convict Petitioner of second-degree murder even though the trial court instructed the jury on second-degree murder as a lesser-included offense of first-degree murder. This suggests that the failure to instruct the jury on the lesser offense of voluntary manslaughter was, at most, harmless error, because the jury was given the option of convicting Petitioner of a lesser offense and

declined to do so. *Abdus-Samad v. Bell*, 420 F.3d 614, 628 (6th Cir. 2005). In other words, because the jury chose to convict Petitioner of first-degree murder, rather than the lesser offense of second-degree murder, there is no basis to believe that the jury would have opted to convict Petitioner of the lesser offense of voluntary manslaughter. *See id.*

For all the foregoing reasons, habeas relief is not warranted on Petitioner's claim that the trial court should have instructed the jury on voluntary manslaughter.

### C. The Sufficiency of the Evidence (claim five)

Petitioner alleges that the evidence at trial was insufficient to sustain his murder conviction. He concedes that there may have been evidence of an intent to kill, but he maintains that there was no evidence of premeditation and deliberation. The Michigan Court of Appeals adjudicated Petitioner's claim on the merits and concluded that there was sufficient evidence of both premeditation and deliberation.

#### 1. Clearly Established Federal Law

"A defendant challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000) (quotations marks and end citation omitted). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) (internal citation and footnote omitted)

24

(emphases in original).

"Two layers of deference apply to habeas claims challenging evidentiary sufficiency." *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010) (citing *Brown v. Konteh*, 567 F.3d 191, 204–05 (6th Cir. 2009)).  First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Brown*, 567 F.3d at 205 (citing *Jackson*, 443 U.S. at 319) (emphasis in original).  Second, even if the Court were "to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphases in original).

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16. "To establish first-degree premeditated murder [in Michigan], the prosecution must prove that the defendant intentionally killed the victim and the act of killing was deliberate and premeditated." *People v. Haywood*, 209  Mich. App. 217, 229; 530 N.W.2d 497, 503 (1995).

The elements in dispute here are premeditation and deliberation.  "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 31 Mich. App. 301, 329; 187 N.W.2d 434, 449 (1971) (footnote omitted).  "Premeditation and deliberation require sufficient time to allow the defendant to take a second look at his actions.  This time interval may be minimal." *People v. Gonzalez*, 178 Mich. App. 526, 531; 444 N.W.2d 228, 230 (1989)  (internal

citation omitted).

"[P]remeditation and deliberation may be inferred from all the facts and circumstances surrounding the incident, including the parties' prior relationship, the actions of the accused both before and after the crime, and the circumstances of the killing itself." *Haywood*, 209 Mich. App. at 229; 530 N.W.2d at 503 (internal and end citations omitted). Premeditation may also be inferred from "the type of weapon used and the location of the wounds inflicted." *People v. Berry*, 198 Mich. App. 123, 128; 497 N.W.2d 202, 204 (1993).

### 2. Application

As noted above in the summary of the facts, Petitioner came out of his house when the three victims arrived there and said to them, "I know y'all didn't come to my house with this Ebony bullshit." When the murder victim (Francois Todd) asked where Petitioner's girlfriend was, Petitioner ran inside his house, acquired a gun, went back outside and fired the gun six times at the three victims. Francois was shot in the back as he fled. He was unarmed, and when his mother asked Petitioner why he shot her son, Petitioner replied, "He shouldn't have ran up on me." He then left the area instead of trying to help the victims and threw away his gun.

A rational trier of fact could have concluded from this evidence taken in the light most favorable to the prosecution that Petitioner premeditated and deliberated the murder. The fact that he went inside his home after the initial confrontation with the victims, retrieved a rifle, and then went back outside and shot at the victims is evidence that he thought about what he was doing. And because he could have stayed inside, he obviously evaluated the situation and deliberated what he was going to do. Shooting his rifle six times in the direction of the victims and making the comment that the murder victim should

26

not have run toward him further demonstrated that his conduct was deliberate and premeditated.

The Court concludes that the evidence was sufficient to support Petitioner's conviction for first-degree, premeditated murder.  Even if the Court had concluded otherwise, the Court must defer to the state court's decision because its decision – that the evidence was sufficient – was not unreasonable.  Petitioner therefore has no right to relief on the basis of his challenge to the sufficiency of the evidence.

### D.  Alleged Interference with the Jury (claim nine)

Petitioner claims that a police officer named Ira Todd entered the jury room while the jurors were deliberating.  According to Petitioner, this conduct amounted to an unauthorized communication with the jurors.  Although the state trial court held an evidentiary hearing on this issue and determined that no one entered the jury room while the jury was present, Petitioner maintains that the state court's decision was based on an unreasonable application of the facts.

### 1.  Clearly Established Federal Law

"The Constitution guarantees . . . criminal . . . litigants a right to an impartial jury." *Warger v. Shauers*, 135 S.Ct. 521, 528 (2014).  And, at least in capital cases, the

> jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.  Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated.  Hence, the separation of the jury in such a way as to expose them to tampering may be reason for a new trial . . . .
>
> Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.

27

*Mattox v. United States*, 146 U.S. 140, 149-50 (1892).

But "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. . . .  Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  "[A] defendant claiming prejudice due to a third party's unauthorized communication with the jury has the burden of proving that prejudice resulted from that contact."  *United States v. Gillespie*, 61 F.3d 457, 459 (6th Cir. 1995).  "Prejudice is not to be presumed."  *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir.1984) (citing *Phillips*, 455 U.S. at 209).

### 2.  Application

Defense counsel first raised the issue of jury tampering at Petitioner's sentencing. The trial court called counsel's allegation "absolutely absurd," stating that the court had "officers right here who kept that jury in custody all the while."  (Sentencing Tr. 6, Mar. 15, 2005.)  The trial court also stated that it generally never left the court when a jury was deliberating and that the only person who had any contact with Petitioner's jury was a deputy named Eddie Thomas.  The court nevertheless advised defense counsel to raise the issue in a motion for new trial.  (*Id.* at 5-6, 16.)

Petitioner subsequently raised the issue of jury tampering on appeal.  The Michigan Court of Appeals found an insufficient basis for appellate consideration of the issue because Petitioner failed to file a motion for new trial or to develop the record in the trial court.  *Gordon*, 2006 WL 2924658, at *4.

Petitioner also raised the issue in post-conviction proceedings by arguing that

defense counsel was ineffective for failing to file a motion for new trial regarding unauthorized communications with the jury.  The trial court's successor (Judge Carole F. Youngblood) held an evidentiary hearing where Petitioner's grandmother testified that she saw Officer Ira Todd peek in the jurors' room during jury deliberations and then come out of the room at a time when neither the judge, nor the clerk, was in the courtroom. (Evidentiary Hr'g Tr.  9-15, Apr. 24, 2009.)

Officer Todd testified at the evidentiary hearing that, although he attended one or two days of the trial, he could not remember whether he was present on the day when the jury was deliberating.[2]  He denied having any conversations with the jurors during or after trial.  (Evidentiary Hr'g Tr., 15-19, May 29, 2009.)  Judge Youngblood determined in her order denying Petitioner's post-conviction motion that, while Petitioner's relative testified honestly about what she believed she saw in the courtroom, there was no other evidence that Officer Todd or anyone else entered the jury room while the jury was present.   The trial court concluded that Petitioner's right to an untainted jury was not violated and, therefore, defense counsel was not ineffective for failing to file a motion for new trial on the issue of jury tampering.

The trial court's "findings are presumptively correct" in this federal habeas corpus action because Petitioner has not rebutted them with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Phillips,* 455 U.S. at 218.  Although Petitioner contends that the state court's decision was based on an unreasonable determination of the facts, the parties

---

[2]  He explained that he was not involved in the case, but that he attended portions of the trial, as his brother was the deceased victim's father.  (Evidentiary Hr'g Tr., 16, May 29, 2009.)

stipulated that their investigators contacted a number of the jurors and that none of the jurors could remember seeing anybody come into the jury room while they were deliberating.  (Evidentiary Hr'g Tr., 3-5, June 19, 2009.)

Even if Petitioner were correct that a police officer exited the jury room while the jury was deliberating, he has not demonstrated or alleged that he suffered any prejudice from the allegedly unauthorized contact.  The Court therefore declines to grant relief on Petitioner's claim that  an officer had an unauthorized contact with the deliberating jurors.

### E.  Trial Counsel (claims two and six)

Petitioner alleges that his trial attorney deprived him of effective assistance of counsel.  More specifically, Petitioner contends that his attorney should have filed a motion for new trial regarding Officer Ira Todd entering the jury room during the jury's deliberations. Petitioner also blames his attorney for his conduct toward the trial judge, for not producing a witness named Meshell Gates and two emergency room physicians, for not objecting to the jury instruction on inferring intent from the use of a weapon, and for not requesting a jury instruction on manslaughter.  The state courts adjudicated these claims and rejected them.

### 1.  Clearly Established Federal Law

To prevail on his claim, Petitioner must show that his attorney's "performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland v. Washington*,  466 U.S. 668, 687 (1984).  The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  "Judicial scrutiny of

counsel's performance must be highly deferential." *Id.* at 689.

The "prejudice" prong of the *Strickland* test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.   Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).

### 2.  Failure to File a Motion for New Trial

Petitioner alleges that his attorney should have filed a motion for new trial regarding Officer Ira Todd entering the jury room during the jury's deliberations.   The trial judge suggested that defense counsel file a motion for new trial, and the Michigan Court of Appeals declined to review the issue of jury tampering on direct appeal due to the lack of a record developed in the trial court.   Further, Judge Youngblood, the trial judge's successor, stated in her order denying Petitioner' motion for relief from judgment that defense counsel should have explored the issue while peoples' memories were still fresh.

Nevertheless, Officer Todd denied communicating with the jury, and the jurors did not recall anyone entering the jury room.  Furthermore, Petitioner's trial attorney testified at the state evidentiary hearing that, even though Petitioner's grandmother and another person informed him during the jury's deliberations that a man had come out of the jury room, he did not bring the matter to the trial court's attention.  (Evidentiary Hr'g, Tr., 106-07, May 22, 2009.)  "[M]isconduct in connection with the jury will not be grounds for a mistrial after a verdict is returned if defendant or his counsel knew of the misconduct prior to return

31

of the verdict and did not advise the court." *United States v. Brumbaugh*, 471 F.2d 1128, 1131 (6th Cir. 1973) (McCree, Cir. J., concurring).

Finally, even assuming that Todd entered the jury room during deliberations, Petitioner has not shown that he was prejudiced by the contact. Therefore, defense counsel's allegedly deficient performance did not prejudice the defense. Petitioner has failed to prove both prongs of the *Strickland* test.

### 3. Provoking the Trial Judge[3]

Next, Petitioner blames his attorney for provoking the trial judge. While it is apparent from the record that defense counsel's conduct annoyed the trial judge at times, counsel's objections, for the most part, were not frivolous. In fact, as pointed out above, the trial court sustained several of defense counsel's objections and overruled several of the prosecutor's objections to defense counsel's questions.

The record indicates that defense counsel represented Petitioner in a persistent and assertive manner, which does not necessarily equate to ineffective assistance. *See, e.g., Ansman v. McDonald*, No. CV 13-2148-RGK(E), 2013 WL 6442606, at *23 (C.D. Cal. Dec. 6, 2013) (unpublished decision rejecting the habeas petitioner's argument that his trial attorney rendered ineffective assistance by "(1) interrupting the proceedings with 466 objections, 269 of which allegedly were 'frivolous and overruled'; (2) precipitating 19 sidebars" and numerous off-the-record discussions; "and (3) engaging in disruptive, obnoxious and unprofessional behavior"). Defense counsel in this case described himself

---

[3] Respondent maintains that Petitioner did not raise this claim in state court and that he no longer has a state remedy to exhaust. A close review of the record, however, indicates that Petitioner raised the issue in the Michigan Court of Appeals and in the Michigan Supreme Court on collateral review.

as a zealous attorney (Evidentiary Hr'g Tr. 7, June 19, 2009), and an attorney's "zealous

advocacy does not amount to a *Strickland* violation." *Bailey v. Smith*, 492 F. App'x 619,

627 (6th Cir. 2012). Like the defense attorney in *Ansman*,

> Petitioner's counsel did not traverse the boundary between zealous advocacy
> and ineffectiveness. Moreover, given the compelling nature of the evidence
> against Petitioner, there is no reasonable probability there would have been
> a different outcome had counsel tempered h[is] style of advocacy to avoid
> any arguable disruptiveness or obnoxiousness.

*Ansman*, 2013 WL 6442606, at *23. The Court therefore rejects Petitioner's contention that

his attorney was constitutionally ineffective because he provoked the trial judge.

### 4. Not Producing Witnesses

#### a. Meshell Gates

Petitioner alleges that defense counsel should have produced his neighbor, Meshell

Gates, as a trial witness. According to Petitioner, Ms. Gates would have testified that, on

the night in question she saw two men with shiny objects in their hands on Petitioner's

porch. Petitioner claims that this testimony would have supported another witness's

testimony that he saw two men creeping up Petitioner's driveway, and it would have

contradicted Latrell Todd's testimony that no one else at the scene was armed.

Petitioner unsuccessfully raised this claim on direct appeal and in his motion for

relief from judgment. Both the Michigan Court of Appeals and the trial court concluded that

the result of the proceedings would not have been different had Ms. Gates been called to

testify. The Michigan Court of Appeals pointed out that, "Gates' proposed testimony is

similar to that of Mark Glover, who testified that while standing in the living room of

defendant's home, he peered out a window and observed 'two guys' creeping up the

driveway." *Gordon*, 2006 WL 2924658, at *3. The Court of Appeals concluded that,

33

"[a]lthough Gates' testimony would have provided additional support for defendant's claim that two individuals attacked him outside his home, given that the jury chose not to believe this theory despite the support offered by Glover," there was not "a reasonable probability that the result of the proceedings would have been different had Gates also been called to testify." *Id.*

This Court agrees with the state court. Gates could have corroborated Mr. Glover's testimony about two men being in Petitioner's driveway. But Petitioner's trial attorney testified at the state evidentiary hearing that his notes on Gates indicated she would not be a good witness. Additionally, he was aware of only one statement from Gates, and that statement indicated she would not be of assistance. (Evidentiary Hr'g Tr. at 77-78, May 22, 2009.)

Furthermore, Petitioner testified that he armed himself after the men left the side of his house. His testimony that he went outside after he was no longer in immediate danger and knowing that the two men might still be outside his house weakened his self-defense theory. Consequently, there is not a substantial probability that the result of the trial would have been different had Ms. Gates testified about two men with shiny objects in their hands being outside Petitioner's home. Defense counsel's allegedly deficient performance did not prejudice Petitioner.

### b. Two Physicians

Petitioner contends that his trial attorney was ineffective for failing to call two emergency room physicians, who would have testified that Francois Todd was shot in the chest, not his back. Petitioner maintains that the testimony would have supported his claim of self defense and raised a reasonable doubt in the jurors' minds.

34

Petitioner's trial attorney testified at the evidentiary hearing that, in retrospect, he probably should have called the first physician. (Evidentiary Hr'g Tr. 82, 85, May 22, 2009.) But Judge Youngblood found no merit in Petitioner's claim because the coroner's report showed that the victim was shot in the back. Judge Youngblood opined that the coroner's report was the most reliable evidence on the issue and, therefore, the testimony of the emergency room doctors would not have resulted in a different outcome at trial. *See* Order Den. Relief from J. at 8, *People v. Gordon*, No. 04-011268-01-FC (3d Cir. Ct. Sept. 22, 2009).

Petitioner contends that there was no testimony on this issue and that the state court's conclusion that the coroner was correct was based solely on the trial court's lay opinion. The forensic pathologist, however, testified that the doctors at the hospital were not trained to examine entrance and exit wounds or to make determinations about them. In her opinion, that type of determination was strictly the province of a forensic pathologist. (Trial Tr. Vol. I, 181, Feb. 14, 2005.)

Given the pathologist's testimony, and the fact that defense counsel did cross-examine her about the report that the decedent was shot in the chest (*id.* at 179-80), there is not a substantial probability that the result of the trial would have been different had the emergency room physicians testified. Therefore, defense counsel was not ineffective for failing to produce the initial physicians as witnesses.

### 5. Not Objecting to, or Requesting, Certain Jury Instructions

Petitioner alleges that defense counsel should have objected to the jury instruction on inferring intent to kill from the use of a dangerous weapon and for not requesting a jury instruction on manslaughter. The Michigan Court of Appeals adjudicated this claim on

35

direct appeal and ruled that

> the trial court did not err by instructing the jury that it could infer the intent to kill from defendant's use of a dangerous weapon, and any error in the failure to instruct the jury on the lesser included offense of voluntary manslaughter was harmless.  Thus, even if counsel's conduct was deficient, defendant's right to a fair trial was not prejudiced.

*Gordon*, 2006 WL 2924658, at *3.

This Court has also determined that the jury instruction on inferring intent to kill did not violate Petitioner's right to due process and that the evidence did not support a jury instruction on voluntary manslaughter.  In light of these conclusions, defense counsel's failure to object to the instruction on intent, and his failure to request an instruction on voluntary manslaughter, did not constitute deficient performance.  "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir.), *cert. denied*, 134 S. Ct. 513 (2013).

### 6.  Summary

For all the reasons given above, defense counsel's performance was not deficient, and the allegedly deficient performance did not prejudice the defense.  Therefore, the state court's conclusions on Petitioner's claims about defense counsel were not contrary to, or unreasonable applications of, *Strickland*.

## IV.  Conclusion

The state courts' rulings on Petitioner's claims were not contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable applications of the facts.  Nor were the state-court decisions "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.  Accordingly, the petitions for writ of habeas corpus are denied.

36

## V. Regarding a Certificate of Appealability and *In Forma Pauperis* Status on Appeal

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Reasonable jurists could debate the Court's assessment of Petitioner's first claim regarding the trial court's conduct and alleged judicial bias.  The Court therefore grants a certificate of appealability on claim one.  And because an appeal could be taken in good faith, Petitioner may proceed *in forma pauperis* on appeal if he appeals this decision.  28 U.S.C. § 1915(a)(3).

Reasonable jurists would not find the Court's assessment of Petitioner's other claims debatable or wrong, nor conclude that those claims deserve encouragement to proceed further.  The Court therefore declines to grant a certificate of appealability on claims two through six and nine.  As previously noted, Petitioner abandoned claims seven and eight.

s/ Nancy G. Edmunds
UNITED STATES DISTRICT JUDGE

Dated: April 9, 2015

37

<u>CERTIFICATION</u>

I hereby certify that a copy of this order was served upon counsel/parties of record on this
9th day of April, 2015 by regular mail and/or electronic means.

<u>s/ Carol J Bethel , Case Manager</u>